**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NICOLE M. ARMOND,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 26-CV-5097** |
| | : | |
| **FALLS TOWNSHIP,** | : | |
| **Defendant.** | : | |

## MEMORANDUM

**SÁNCHEZ, J.** **OCTOBER 14, 2026**

*Pro se* Plaintiff Nicole M. Armond brings this civil action pursuant to the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("RA"), and the Fair Housing Act ("FHA") against Falls Township ("the Township"). She also seeks leave to proceed *in forma pauperis*, the appointment of pro bono counsel, and has filed a Motion for Expedited Consideration of her IFP Application and Amended Complaint. Because Armond is eligible to proceed *in forma pauperis*, the Court will grant her leave to do so. However, the Court will deny the request for appointment of counsel and dismiss her Amended Complaint on statutory screening pursuant to 28 U.S.C. § 1915 without prejudice. The Motion for Expedited Consideration will be denied as moot.

## I. FACTUAL ALLEGATIONS[1]

[1] The facts set forth in this Memorandum are taken from Armond's Amended Complaint (ECF No. 5), which when filed became the governing pleading in the case. *See Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) ("If a plaintiff amends her complaint, the new pleading 'supersedes' the old one: The 'original pleading no longer performs any function in the case.'" (citation omitted)); *see also Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019) ("In general, an amended pleading supersedes the original pleading and renders the original pleading a nullity. Thus, the most recently filed amended complaint becomes the operative pleading.") (internal citations omitted). The Court cannot look to the original

Armond alleges that she suffers from "disability-related visual impairments and neurological symptoms" that impact her ability to communicate and process information, her memory, executive function, and concentration.[2] (Am. Compl. at 4.) In late November 2022, she and her two minor children were residing at the Castle Club Apartments in Falls Township. (*Id.* at 5.) On or about November 30, she observed damage to the bathroom ceiling above the toilet area in her apartment, took photographs, and sent a maintenance request the next day to the property manager. (*Id.*) On January 17, 2023, Armond sent an updated request, noting that the condition of the ceiling had worsened to the point that a hole had formed from the water damage. (*Id.*) She sent additional updates on January 26 and January 27 as the ceiling damage became worse, including falling debris and rainfall entering the apartment. (*Id.* at 5-6.) Eventually Armond received a response from Property Manager Deanna O'Donnell stating that she would "remind Nick about it today." (*Id.* at 6.)

Maintenance staff eventually came to inspect the ceiling but advised Armond that they could not repair it until damage to the roof was fixed. (*Id.*) For months, however, no repairs were made to the roof. (*Id.*) On June 5, 2023, Armond emailed O'Donnell requesting an update on the repairs. (*Id.*) O'Donnell responded, "I will speak to the tech about the ceiling" but no follow-up occurred. (*Id.*) On October 16, 2023, Armond again emailed O'Donnell about both a heating issue

---

Complaint "to help fill the factual void in [the plaintiff's] amended complaint." *March v. Dep't of Defense*, No. 25-1650, 2025 WL 2417754, at *1 (3d Cir. Aug. 21, 2025) (*per curiam*) (citing *Royal Canin U.S.A.*, 604 U.S. at 35); *see also Argentina v. Gillette*, 778 F. App'x 173, 175 n.3 (3d Cir. 2019) (*per curiam*) (explaining that "liberal construction of a *pro se* amended complaint does not mean accumulating allegations from superseded pleadings"). The Court adopts the pagination assigned to the Amended Complaint by the CM/ECF docketing system.

[2] Although not addressed in her Amended Complaint, Armond attaches medical records to her Motion for Appointment of Counsel reflecting that her neurological dysfunction stems at least in part from a 2016 car accident in which she sustained a traumatic brain injury. (*See* ECF No. 6-2.) The Amended Complaint describes in great detail the impact of Armond's disabilities on her everyday life.

and the unresolved ceiling damage. (*Id.* at 6-7.) O'Donnell told Armond to file a maintenance request online, which Armond did the next day. (*Id.* at 7.) Although the heating issue was subsequently addressed, management failed to repair the roof and ceiling. (*Id.* at 8.)

After speaking with Rayonne Grizzle, a staff member at the Fair Housing Rights Center in Southeastern Pennsylvania, Armond decided to arrange for her own independent environmental health testing of the conditions in her apartment. (*Id.*) She hired a company to test for mold, which was completed on April 3, 2024, and identified "airborne fungal structures within both the affected bathroom and the indoor comparison area, including Aspergillus/Penicillium-like spores and Cladosporium." (*Id.* at 8-9.) Around this time, Armond also became concerned about the possibility that she and her family may have been exposed to asbestos or other hazardous materials as a result of the deteriorating ceiling. (*Id.*) On April 10, 2024, she contacted the property management company, Emess Management, requesting that they arrange for inspection of the ceiling cavity and surrounding building material and test for potentially hazardous materials. (*Id.* at 9-10.) Around this time, one of Armond's disability advocates discovered that in Emess's online maintenance request system, there was an entry from July 2023 which marked the ceiling repair as "Completed" even though no repairs had been done. (*Id.* at 10.) Armond "confronted" Emess with this information and asked when the repairs would be done, but received no response. (*Id.*)

After Emess failed to respond, on April 11, 2024, Armond contacted Falls Township Code Enforcement for assistance. (*Id.*) In her communication, Armond "explained that [she] had medical conditions requiring others to advocate on her behalf," advised the Township that she had "not received notice of any inspection despite learning from other residents that inspections had begun within her building, described the ongoing bathroom ceiling damage and repeated intrusion of unknown materials since November 2022, and requested guidance

concerning inspection of [her] apartment" in light of management's failure to resolve the issues. (*Id*. at 10.) Armond received a response the same day from Deborah Perkiss of Falls Township Code Enforcement/Licenses & Inspections, informing Armond that she had opened a complaint for her case and assigned it to Inspector Jim Molimock. (*Id*. at 10-11.) Perkiss provided Armond with Molimock's phone number and email address so that Armond could communicate with him directly. (*Id*. at 11.) Armond then "initiated direct communication" with Molimock, in which she "advised [him] that email communication would be the preferred method of communication regarding the matter and copied her representative on the correspondence." (*Id*.) She included in the email updated information regarding the state of her deteriorating bathroom ceiling and the inspections taking place in other units within her building. (*Id*.)

On April 12, 2024, contractors hired by Emess opened Armond's bathroom ceiling to perform the necessary repairs. (*Id*.) Armond observed that the bathroom exhaust ventilation duct was detached, along with "unknown materials and debris" in the ceiling cavity that caused her concern. (*Id*.) She took photos and sent them to Emess and Molimock. (*Id*.) She also wrote to Emess requesting that additional testing be done of the removed ceiling materials before the ceiling cavity was closed, based on her view that the unknown materials and the detached exhaust ventilation duct "raised additional concerns regarding environmental hazards." (*Id*.) She also requested that air testing be done before the ceiling cavity was closed, copying Molimock on her communications. (*Id*.) Deanna O'Donnell responded that Emess would conduct testing of the removed ceiling materials but did not want to leave the ceiling cavity exposed for an extended period of time in light of Armond's concerns. (*Id*. at 12.) Armond and O'Donnell corresponded back and forth regarding who would be responsible for the cost of any testing. (*Id*.) Ultimately,

O'Donnell stated that the contractors would return to complete the repair work, leaving unresolved the question of what testing, if any, would occur before the work was complete. (*Id*. at 12-13.)

On April 17, 2024, Armond contacted the Bucks County Health Department ("BCHD") "seeking guidance regarding the unresolved conditions within [her] apartment." (*Id*. at 13.) She copied Molimock and Emess on the correspondence. (*Id*.) While she awaited a response, Armond reached out again directly to Molimock on April 22, 2024, requesting a reasonable accommodation pursuant to Section 504 of the Rehabilitation Act. (*Id*.) Specifically, she:

> requested that all information, updates, responses to inquiries, and matters pertaining to [her] file be communicated to [her] in writing only because [her] documented disabilities impaired hearing, comprehension, understanding, information processing, and memory retention. [She] explained that the requested accommodation was necessary to ensure effective communication and equal access to participate in governmental programs, activities, and procedures.

(*Id*.) Armond also noted in her email that she had already attempted multiple times to contact Molimock for assistance with her complaint, without success, and requested a response to her prior inquiries. (*Id*. at 13-14.)

After receiving no immediate response from Molimock, Armond forwarded the message to Deborah Perkiss the next day, "expressly reissued [her] request for a reasonable accommodation[,]" and highlighted the urgency of the matter, given the potential threat to her family's health and safety. (*Id*. at 14.) Perkiss responded the same day that she had opened another complaint based on Armond's concerns and forwarded it to Molimock and her supervisor. (*Id*.) She again provided Armond with Molimock's direct phone number. (*Id*.) Armond responded, thanking Perkiss and reiterating that due to her disabilities she required all communications to be in writing. (*Id*.) In a reply, Perkiss "advised [Armond] that she had also forwarded [Armond's]

photographs and stated that, after forwarding the matter to her supervisor, [Armond] would be contacted." (*Id.*)

After receiving no response to her April 17, 2024 email to BCHD, Armond sent a second message on April 24, 2024, which "reiterated [her] ongoing concerns regarding the habitability of the apartment, the absence of environmental testing following the April 12 opening of the bathroom ceiling, [her] need for guidance regarding the safety of the apartment, and [her] continued inability to obtain a response" from Molimock. (*Id.* at 15.) Her message "again requested that communications be conducted in writing as a reasonable accommodation pursuant to Section 504 of the Rehabilitation Act because of [her] documented disabilities affecting hearing, comprehension, information processing, and memory retention." (*Id.*) Later that day, Armond received a response from Stephen Bobbs, an Environmental Protections Specialist from BCHD, stating that he had "contacted Castle Clubs' management regarding [Armond's] complaint [and that] management had informed him the bathroom ceiling had been repaired and the affected area finished with sheetrock." (*Id.*) Bobbs also explained that BCHD did not have regulatory authority pertaining to mold or asbestos and that those concerns would have to be addressed through the Township. (*Id.*) On April 29, 2024, Armond provided Emess with written notice of her intent to terminate the lease for her apartment. (*Id.* at 23.) She requested 60 days to vacate the apartment so that she could conduct additional testing and safely vacate the rental. (*Id.*)

During this time, Armond was receiving legal counsel on a separate landlord-tenant dispute from Robert Kim, an attorney with Legal Aid of Southeastern Pennsylvania. (*Id.* at 15-16.) Armond shared with Kim information regarding her ongoing concerns over habitability at the Castle Clubs apartment and the lack of response from the Township. (*Id.* at 16.) Based on Kim's advice, Armond ultimately decided to hire Southeast Environmental Microbiology Laboratories

("SEEML"), a contractor, to conduct additional environmental testing of the apartment. (*Id.* at 17-18.) On May 7, SEEML issued an initial report based on testing of materials "associated with the bathroom ceiling and insulation." (*Id.* at 18.) The initial testing "appeared to depict drywall material and cellulose insulation" but a SEEML manager recommended additional testing of the pipe wrap and tape. (*Id.*) SEEML issued a second report on May 24, 2024. (*Id.*) On May 29, 2024, Armond emailed the second SEEML report to Perkiss, copying Molimock, in which she "summarized the independent laboratory findings, including the identification of fiberglass, gypsum, and silica-containing cementitious materials within samples collected from the bathroom ceiling cavity, and further advised that independent mold testing had also been performed, although [she] had not yet received that report." (*Id.* at 19.) Armond reiterated her request for guidance from the Township regarding "the appropriate remediation, cleaning, handling, and disposal procedures necessary to safely vacate the apartment" and "renewed [her] previously requested reasonable accommodations . . .that all recipients remain included in the email correspondence because [her] disabilities required the continued participation of [her] support circle to facilitate effective communication[.]" (*Id.* at 19-20.) Perkiss responded to Armond the same day, apologized that Armond still had not heard from Molimock, advised Armond that she had entered yet another complaint for her, again provided Molimock's direct phone number, forwarded Armond's correspondence to Licensing & Inspections Manager Matt Takita, and provided Armond with Takita's email address. (*Id.* at 20.)

Armond sent an email to Takita the next day, seeking guidance on how to proceed with safely vacating her apartment, and reiterating her reasonable accommodation request that all communications about her case be conducted via email. (*Id.*) Takita did not respond to the email. (*Id.*) Armond send Takita a second email on June 3, 2024, reiterating her prior requests, noting

that environmental testing "had identified mold and that independent laboratory analysis had identified fiberglass and silica-containing cementitious materials associated with the bathroom ceiling and ceiling cavity," and seeking guidance on "the appropriate procedures for safely cleaning the apartment, handling personal belongings, disposing of potentially contaminated materials, and relocating [Armond] and [her] family." (*Id.* at 21.) Armond received no response to her email. (*Id.*)

On July 22, 2024, Armond and her children vacated the apartment "despite having no stable permanent residence secured" for herself and her family, and "without having received the governmental guidance repeatedly requested from Falls Township Code Enforcement regarding environmental safety, remediation, cleaning procedures, the handling and disposal of potentially affected personal property, or the safe relocation of Plaintiff and Plaintiff's family." (*Id.* at 24.) Armond alleges that following her departure from the Castle Club apartment, she and her family experienced housing instability and homelessness, including shuttling between a shelter in the Bronx, temporary housing in Bucks County, a friend's home in Harrisburg, living out of her vehicle, and staying at a shelter in Philadelphia. (*See generally id.* at 24-36.) Armond also experienced worsening of her medical conditions, including multiple hospitalizations and meetings with specialists that confirmed her cognitive decline and worsening impairments. (*Id.* at 29-43.) Armond's infant son was also diagnosed with sickle cell anemia around this time, complicating her search for appropriate housing due to his vulnerability to infection in a congregate housing setting.[3] (*Id.* at 26-28.)

[3] Armond's factual allegations regarding this period are extensive, comprising nearly 20 pages and spanning events from July 2024 to June 2026, mostly focused on her housing instability, child custody issues, and health challenges. Because these facts do not bear any obvious relevance to Armond's ADA, RA, and FHA claims against Falls Township, the Court does not recount them in detail.

Based on the above allegations, Armond asserts against the Township three claims under Title II of the ADA, a Section 504 claim, and two FHA claims. She seeks a declaratory judgment that the Township violated her rights under the relevant federal statutes, unspecified additional declaratory and injunctive relief, compensatory damages, costs, and attorney's fees. (*Id.* at 50.)

## II. STANDARD OF REVIEW

The Court will grant Armond leave to proceed *in forma pauperis* because it appears that she is incapable of paying the fees to commence this civil action. Accordingly, 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Amended Complaint if it fails to state a claim. Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 560 U.S. 544, 556 (2007)). At this early stage of the litigation, the Court will accept the facts alleged in the *pro se* Amended Complaint as true, draw all reasonable inferences in Armond's favor, and ask only whether the Amended Complaint contains facts sufficient to state a plausible claim. *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197, 204 (3d Cir. 2024). Conclusory allegations do not suffice. *Iqbal*, 556 U.S. at 678.

Because Armond is proceeding *pro se*, the Court construes her allegations liberally. *See Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)). The Court will "apply the relevant legal principle even when the complaint has failed to name it." *Id.* (quoting *Mala*, 704 F.3d at 245). However, "pro se litigants

still must allege sufficient facts in their complaints to support a claim." *Id.* (quoting *Mala*, 704 F.3d at 245). An unrepresented litigant "cannot flout procedural rules — they must abide by the same rules that apply to all other litigants." *Mala*, 704 F.3d at 245; *see also Doe v. Allegheny Cnty. Hous. Auth.*, No. 23-1105, 2024 WL 379959, at *3 (3d Cir. Feb. 1, 2024) (*per curiam*) ("While a court must liberally construe the allegations . . . this does not require the court to act as an advocate to identify any possible claim that the facts alleged could potentially support.").

## III. DISCUSSION

### A. ADA and Section 504 Claims

Armond asserts three separate claims against the Township under Title II of the ADA, for "Failure to Provide a Reasonable Modification" (Count I), "Failure to Ensure Effective Communication" (Count II), and "Denial of Meaningful and Equal Access to Code Enforcement Services" (Count III). All three claims, while presented under different headings, are largely duplicative and allege the same failure by the Township to accommodate Armond's communication needs, in violation of the ADA and the RA.[4] Because the substantive standards for determining liability under Section 504 and Title II are the same, the Court analyzes them together.[5]

---

[4] Moreover, there is no standalone cause of action under the ADA or RA for "Failure to Ensure Effective Communication" or "Denial of Meaningful and Equal Access to Code Enforcement Services" which, as alleged here, are simply different ways to describe the same failure to accommodate.

[5] See *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 117 (3d Cir. 2018) ("[W]hen a plaintiff sues under both the RA and the ADA, [courts] often address both claims in the same breath, construing the provisions of both statutes in light of their close similarity of language and purpose," since "the scope of protection afforded under both statutes, *i.e.*, the general prohibition against discrimination, is materially the same." (citation modified)). While the substantive standards are the same, a party who seeks to proceed under § 504 "must show that the allegedly discriminating entity receives federal funding." *McDonald-Witherspoon v. City of Philadelphia*, 481 F. Supp. 3d 424, 439 (E.D. Pa. 2020) (citing *CG v. Pa. Dep't of Educ.*,

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a plausible claim under the ADA or the RA, a plaintiff must allege that "(1) he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." *Montanez v. Price*, 154 F.4th 127, 146 (3d Cir. 2025) (citing *Haberle v. Troxell*, 885 F.3d 170, 178-79 (3d Cir. 2018)), *cert. denied*, 2026 WL 1718015 (U.S. June 15, 2026). "[U]nlike other discrimination claims, failure to accommodate claims do not require that [a defendant's] action be motivated by a discriminatory animus directed at the disability[.]" *Dreibelbis v. County of Berks*, 438 F. Supp. 3d 304, 316 n.20 (E.D. Pa. 2020) (citation and internal quotation marks omitted). However, where, as here, a plaintiff seeks compensatory damages, she must allege "intentional discrimination under a deliberate indifference standard." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019) (citing *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013)). To do so, Armond must allege that (1) Falls Township had "knowledge that a federally protected right is substantially likely to be violated," and (2) the Township failed "to act despite that knowledge." *Id.* at 292 (citing *S.H. ex rel. Durrell*, 729 F.3d at 265).

To be considered a "qualified individual with a disability" under Title II, a plaintiff must allege that he has a "disability" which is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual. . . ." 42 U.S.C.

---

734 F.3d 229, 235 n.10 (3d Cir. 2013)); *see also* 29 U.S.C. § 794(a). Armond alleges that the Township receives federal funding from the American Rescue Plan Act, (*see* Am. Compl. at 46-47), thus satisfying this pleading requirement of a Section 504 claim.

§ 12102(1)(A). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* at § 12102(2)(A). To satisfy the pleading standard, it is not necessary to allege a prima facie case. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002). The complaint need only allege enough facts to "raise a reasonable expectation that discovery will reveal evidence of [each] necessary element." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)).

Armond describes her extensive physical and cognitive disabilities, and alleges facts suggesting that she was otherwise eligible to receive assistance from the Township's Code Enforcement department. Thus, she pleads the first two elements of an ADA/Section 504 claim. She also plausibly alleges that, due to the failure of Township employees to respond to her messages, she was denied the benefit of the Township's assistance with the habitability issues presented at her rental apartment. Because Armond seeks compensatory damages for the violation of her rights under the ADA and RA, she must also plead sufficient facts to suggest that discovery will reveal evidence that the Township intentionally discriminated against her based on her disability. *See Brown v. Clemens*, No. 22-1067, 2025 WL 2422615, at *10 (M.D. Pa. Aug. 21, 2025) ("[B]inding circuit precedent is clear on the matter: An ADA or RA claim for compensatory damages requires allegations of intentional discrimination under a deliberate indifference standard. The assertion of a failure to accommodate claim does not relieve the plaintiff of [the] requirement" (internal citations omitted)). Armond fails to do so. She alleges that she sent multiple emails to two Township employees, Inspector Molimock and Supervisor Takita, and that they failed completely to respond to those messages. Deliberate indifference "does not require a showing of

personal ill will or animosity toward the disabled person. However, it must be a deliberate choice, rather than negligence or bureaucratic inaction." *S.H. ex rel. Durrell*, 729 F.3d at 263 (citation modified). The facts alleged do not suggest that Molimock or Takita made a deliberate choice to ignore her emails; rather, the two Township employees merely failed to respond to Armond's messages. *See Sch. Dist. of Philadelphia v. Kirsch*, 722 F. App'x 215, 228 (3d Cir. 2018) (affirming dismissal of ADA and Section 504 claims based on deliberate indifference where the appellants did not present evidence suggesting that a school district's "failure to respond to emails during the summer break was a deliberate choice rather than negligence or bureaucratic inaction"); *see also Owens v. Armstrong*, 171 F. Supp. 3d 316, 333 (D.N.J. March 22, 2016) (finding that plaintiff did not plead facts suggesting deliberate indifference claim where he "mailed several motions and documents to the court describing his disability" and his need to attend a hearing via videoconference, but the court nevertheless issued a transportation writ for the hearing, where there were no facts suggesting the court had actually read the motions and documents). Because Armond does not provide any allegations suggesting that the failure by Molimock and Takita to respond to her request for an accommodation was the result of deliberate indifference as opposed to "negligence or bureaucratic inaction," her ADA and RA claims are not plausible and will be dismissed. However, she may amend her claim if she can cure the deficiencies noted by the Court.

## II. FHA Claims

The FHA, passed by Congress as Title VIII of the Civil Rights Act of 1968 and amended by the Fair Housing Amendments Act (FHAA) of 1988 to protect disabled persons, makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services in connection with such a dwelling, because of the handicap of that person . . . ." 42 U.S.C. § 3604(f)(2). Armond asserts claims against the

Township under two provision of the FHA. The Court will explain below why neither claim is plausible.

**1. Section 3604(f)(3)(B)**

Armond's brings her first claim against the Township under Section 3604(f)(3)(B). That statute provides that "discrimination" under the Act includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity *to use and enjoy a dwelling*" (emphasis added). "[I]n evaluating a failure-to-accommodate claim under the FHAA, the Court must 'consider whether the requested accommodation is (1) reasonable and (2) necessary to (3) afford handicapped persons an equal opportunity to use and enjoy housing.'" *Jones v. Philadelphia Hous. Auth.*, No. 25-6244, 2026 WL 1103707, at *6 (E.D. Pa. Apr. 23, 2026) (quoting *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 110 (3d Cir. 2017)). "'[N]ecessary' means 'required.' It is a high standard[, so the Court] must consider what is necessary to satisfy the particular disabled person's need." *Id.* (quoting *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018)). "Necessities do not include conveniences and creature comforts, much as they are desirable or even helpful . . . . In short, the [FHAA]'s necessity element requires that an accommodation be essential, not just preferable." *Id.* (quoting *Vorchheimer*, 903 F.3d at 106). To survive dismissal, "a plaintiff need only plausibly plead enough facts to make out the three elements set forth in § 3604(f)(3)(B): refusal, reasonable accommodation, and necessity/equal opportunity." *Id.* (quoting *Vorchheimer*, 903 F.3d at 111).

Armond's claims are based on her allegation that two Township employees failed to respond to her communications regarding habitability issues at her apartment and her request that all communications be conducted in writing and include her support network. A failure to respond

to a request for accommodations may be deemed a denial or refusal of the request for purposes of an FHAA claim. *See Newman v. Nazcr Trac Prop. Owners Ass'n, Inc.*, 601 F. Supp. 3d 357, 366 (E.D. Wis. 2022) (explaining that "the mere failure to meaningfully respond to Plaintiffs' request [for a reasonable accommodation under the FHAA] may be enough to constitute a wrongful denial" (citing *Montano v. Bonnie Brae Convalescent Hosp., Inc.*, 79 F. Supp. 3d 1120, 1127–28 (C.D. Cal. 2015)). Thus, Armond plausibly alleges that her request for an accommodation was effectively "refused" for purposes of an FHAA claim. However, she does not allege facts indicating that she sought modification of a rule, policy, practice, or service related to her ability "to use and enjoy" her dwelling. Rather, she states that she needed the accommodation "to meaningfully participate" in communications with a governmental agency charged with enforcing local housing regulations. (Am. Compl. at 48.) In effect, she sought accommodations affording her equal opportunity to *communicate with a government agency*, rather than to use and enjoy her dwelling. *See Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1190-91 (9th Cir. 2021) (explaining that to allege a Section 3604(f)(3)(B) claim, "[t]he plaintiff's disability must cause the need for an accommodation in the 'rules, policies, practices, or services.' In other words, absent an accommodation, the plaintiff's disability must cause the plaintiffs to lose an equal opportunity to use and enjoy a dwelling."); *see also Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1104 (3d Cir. 1996) (explaining that "the FHAA's 'reasonable accommodations' provision prohibits the enforcement of 'zoning ordinances and local housing policies in a manner that denies people with disabilities access to housing on par with that of those who are not disabled.'" (quoting Laurie C. Malkin, *Troubles at the Doorstep: The Fair Housing Amendments Act of 1988 and Group Homes for Recovering Substance Abusers,* 144 U. Pa. L. Rev. 757, 804 (1995)). The Court is aware of no federal case interpreting Section 3604(f)(3)(B) in the manner Armond suggests here. Based on the

Court's review of cases in this Circuit involving 3604(f)(3)(B) claims, they arise almost exclusively from land use decisions impacting housing for individuals with disabilities. *See, e.g.*, *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 446 (3d Cir. 2002) (real estate developer sued board of adjustment for failing to "make reasonable accommodations" in violation of Section 3604(f)(3)(B)) by rejecting a variance request and site plan for building housing for the disabled elderly); *Allentown Victory Church v. City of Allentown, Pa.*, No. 22-2817, 2024 WL 3439772, at *1 (3d Cir. July 17, 2024) (developer sued City under Section 3604(f)(3)(B) after zoning hearing board denied variance for construction of transitional housing for men leaving jail or a substance abuse treatment facility); *Res. for Hum. Dev., Inc. v. Lower Providence Twp.*, No. 24-2245, 2025 WL 935572, at *1 (E.D. Pa. Mar. 27, 2025) (non-profit sued township under Section 3604(f)(3)(B) over denial of a zoning permit to build supportive housing). Because Armond's claim arises from an alleged failure to accommodate her communication needs rather than a request for modification to "rules, policies, practices, or services" impacting her ability to use or enjoy housing, her claim is not plausible and will be dismissed.

**2. Interference With the Exercise and Enjoyment of Housing**

Armond also asserts a claim under Section 3617 of the FHA, which prohibits coercing, intimidating, threatening, or interfering with "any other person in the exercise or enjoyment of" any right granted or protected by the substantive provisions of the Act.[6] *El v. People's Emergency Ctr.*, 438 F. Supp. 3d 283, 291 (E.D. Pa. 2020) (quoting 42 U.S.C. § 3617) (footnote omitted). Armond appears to allege a claim under the "interfering" part of the statute, stating that the

[6] The Department of Housing and Urban Development has issued regulations providing a non-exhaustive list of conduct that is unlawful under that section of the FHA. 24 C.F.R. § 100.400(c).

Township "interfered with [her] exercise and enjoyment of rights protected by the Fair Housing Act by failing to administer its Code Enforcement functions in a manner that afforded [her] meaningful access despite her disabilities, after receiving repeated notice of [her] disability-related accommodation needs." (Am. Compl. at 49.) She "further alleges that [the Township's] conduct interfered with [her] ability to seek governmental assistance regarding alleged housing hazards, pursue disability-related accommodations necessary for equal participation, and meaningfully access the Township's housing-related complaint and inspection processes." (*Id.*) To state a claim under Section 3617, a plaintiff must allege "that (1) [she] is a protected individual under the FHA, (2) [she] was engaged in the exercise or enjoyment of [her] fair housing rights, (3) the defendants coerced, threatened, intimidated, or interfered with the plaintiff on account of [her] protected activity under the FHA, and (4) the defendants were motivated by an intent to discriminate." *Id.* (citations and footnote omitted). However, Armond does not allege that the Township or its employees engaged in any affirmative conduct that interfered with her rights under the ADA; rather, she asserts that they failed to respond to her numerous emails. This is insufficient to allege interference within the meaning of Section 3617. *See Fowler v. Borough of Westville*, 97 F. Supp. 2d 602, 613-14 (D.N.J. 2000) (explaining that the term "interfere with" in Section 3617 encompasses such "'overt acts' as racially-motivated firebombings and sending threatening notes, and also 'less obvious, but equally illegal,' practices such as exclusionary zoning, deflating appraisals, and insurance redlining." (quoting *Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 347 (6th Cir. 1994))); *see also Revock*, 853 F.3d at 113 (noting that "the prohibition on interference [in Section 3617] 'cannot be so broad as to prohibit any action whatsoever tha[t] in any way hinders a member of a protected class.'") (quoting *Brown v. City of Tucson*, 336 F.3d 1181, 1192 (9th Cir. 2003)). Because Armond does not allege any conduct

conceivably amounting to interference under Section 3617, her claim under that provision fails and will be dismissed without prejudice.

## IV. CONCLUSION

Armond's Amended Complaint will be dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). The Court will grant Armond leave to file a second amended complaint in the event she can cure the deficiencies the Court has identified. Armond's Motion for Appointment of Counsel (ECF No. 6) will be denied as premature[7] and her Motion for Expedited Consideration (ECF No. 8) will be denied as moot. An Order follows, containing additional instructions as to amendment.

BY THE COURT:

/s/ Juan R. Sánchez

Juan R. Sánchez, J.

[7] Although district courts have broad discretion to request counsel for indigent *pro se* litigants, appointment of counsel is not a statutory or constitutional right of the litigant, but rather a privilege. *See Brightwell v. Lehman*, 637 F.3d 187, 192 (3d Cir. 2011) (citation omitted); *Montgomery v. Pinchak*, 294 F.2d 492, 498 (3d Cir. 2002). In determining whether to appoint *pro bono* counsel, the Court must first consider, as a threshold matter, whether the plaintiff's claim has "some merit in fact and law." *Tabron v. Grace*, 6 F.3d 147, 155 (3d Cir. 1993). Armond's request to appoint counsel at this stage of the litigation is premature because her claims have not survived statutory screening under 28 U.S.C. § 1915. She may reassert her request if the Court permits any of her claims to proceed.